# Supreme Court of Texas

No. 21-0130

The State of Texas,

*Petitioner*,

v.

Volkswagen Aktiengesellschaft,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

*~ consolidated for oral argument with ~*

No. 21-0133

The State of Texas,

*Petitioner*,

v.

Audi Aktiengesellschaft,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

JUSTICE DEVINE delivered the opinion of the Court, in which Justice Lehrmann, Justice Boyd, Justice Busby, Chief Justice Sudderth,[1] and Justice Tijerina[2] joined.

JUSTICE HUDDLE filed a dissenting opinion, in which Chief Justice Hecht and Justice Bland joined.

The State of Texas and several local governments brought civil actions to enforce state environmental laws against German automobile manufacturers that intentionally evaded compliance with federal emissions standards by embedding illegal, emissions-beating technology in branded vehicles. The issue in this highly unusual personal-jurisdiction dispute is whether Texas courts have specific jurisdiction over the manufacturers based on their intentional post-sale tampering with affected vehicles that were owned, operated, and serviced in Texas.

After an affiliated, Virginia-based distributor independently sold more than half a million affected vehicles nationwide, the manufacturers developed software updates designed to further conceal and perpetuate continued operation of the defeat-device technology. Leveraging fake recall campaigns and routine service opportunities, the manufacturers specifically targeted affected vehicles by vehicle

---

[1] The Honorable Bonnie Sudderth, Chief Justice of the Court of Appeals for the Second District of Texas, sitting for JUSTICE BLACKLOCK by commission of the Honorable Greg Abbott, Governor of Texas, pursuant to section 22.005 of the Texas Government Code.

[2] The Honorable Jaime E. Tijerina, Justice of the Court of Appeals for the Thirteenth District of Texas, sitting for JUSTICE YOUNG by commission of the Honorable Greg Abbott, Governor of Texas, pursuant to section 22.005 of the Texas Government Code.

identification number (VIN) and employed a distribution system under their contractual control to install the updates in vehicles serviced in Texas. The manufacturers released the software updates to servers in Germany that were synchronized with the distributor's stateside server, which automatically made the updates available to the distributor's Texas dealerships for installation through the manufacturers' proprietary system in the targeted vehicles. The distributor and its dealerships were contractually required to fulfill the manufacturer-initiated recall and service campaigns when, as, and how the manufacturers directed.

In the civil-enforcement actions, the manufacturers have contested personal jurisdiction on the basis that (1) any contacts with Texas were solely by the distributor and dealerships and cannot be imputed to the manufacturers and (2) any domestic contacts on the manufacturers' part targeted the United States as a whole, not Texas specifically, because the contacts were undifferentiated in kind and quality among the vast majority of states. The determinative question is whether the manufacturers' contacts with Texas, accomplished through direct and indirect control over instrumentalities and intermediaries, satisfy constitutional requisites to exercising specific personal jurisdiction. They do.

The German manufacturers purposely structured their relationships with the distributor and dealerships to retain control over after-sale recalls and repairs and then used that control to tamper with vehicles in Texas after the initial sale to consumers. The manufacturers had—and exercised—the sole authority to initiate the recall and service campaigns at issue and provided and approved deceptive content for

3

related customer and dealership messaging. Under the terms of importer agreements, the distributor was contractually required to deploy its dealership network to implement the recall and service campaigns on vehicles the manufacturers had specifically identified, including tens of thousands of cars owned and operated in Texas. The distributor agreements also gave the manufacturers control over the dealership network in those recall and service actions, and the dealers used the manufacturers' proprietary diagnostic system to install the tampering software in Texas. Unlike myriad software updates that might be accomplished in the ordinary course of consumer transactions with downloads initiated by the consumer or without regard to the consumer's location, these contacts with Texas were not fortuitous or accomplished by the unilateral actions of third parties.

We also do not agree that the manufacturers' contacts were not purposefully directed at Texas simply because the same actions were also directed at other states. Personal jurisdiction is a forum-specific inquiry, and a defendant's contacts with other states do not negate purposeful availment of this jurisdiction regardless of whether out-of-state contacts are more, less, or exactly the same.[3] Because we agree with the trial court that the manufacturers are amenable to specific personal jurisdiction in Texas, we reverse the court of appeals' judgment and remand to the trial court for further proceedings.

---

[3] *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 10 (Tex. 2021).

4

## I. Background

These consolidated interlocutory appeals arise from "Dieselgate," a highly publicized scandal in which foreign automobile manufacturer Volkswagen Aktiengesellschaft (VW Germany) pleaded guilty in federal court to three felony counts for designing and intentionally installing parts and software to circumvent federal emissions standards by altering the way motor vehicles sold in the United States operated during emissions testing.[4]  Under federal law, "defeat devices" of this nature are illegal,[5] and motor vehicles equipped with such devices may not be sold in any state.[6]  In defiance of the applicable regulatory

---

[4] The facts pertaining to the Dieselgate scandal are essentially uncontested and derive from the "Statement of Facts" incorporated into the plea agreement between the United States Department of Justice and VW Germany.  As part of the plea agreement, VW Germany agreed it would "neither contest the admissibility of, nor contradict" those stipulated facts "in any proceeding."

[5] Federal law provides that "[t]he following acts and the causing thereof are prohibited":

> [F]or any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use . . . .

42 U.S.C. § 7522(a)(3)(B); *see also* 40 C.F.R. §§ 86.1803-01 (defining a defeat device), 18.1809-10–.1809-12 (prohibiting defeat devices), 86.1854-12 (prohibited acts).

[6] *See* 42 U.S.C. §§ 7521(a)(4), 7525(a)(1), (a)(3)(A); *see also id.* § 7522(a)(3)(B).

5

requirements, VW Germany surreptitiously implanted defeat-device technology on half a million domestic vehicles for nearly a decade[7]—first to secure federal certifications necessary to sell the affected products in the U.S. and then again during routine-service and fabricated-recall campaigns initiated after those vehicles were already traversing roadways nationwide, including in Texas. After-sale tampering was employed to avoid mounting warranty expenses caused by defects in the original defeat-device technology and served to further conceal the artifice. In this opinion, we refer to automobiles equipped with defeat-device technology as "Affected Vehicles."

VW Germany implemented this unlawful scheme in concert with its majority-owned subsidiary, Audi Aktiengesellschaft (Audi),[8] and through its wholly owned subsidiary, Volkswagen Group of America, Inc. (VW America), among others. Like VW Germany, Audi is a German car manufacturer incorporated under German law and headquartered in Germany. VW America, which is incorporated in New Jersey and headquartered in Virginia, serves as the exclusive importer and distributor for both VW Germany and Audi automobiles in the United States and its territories. In that capacity, VW America is responsible for the importation, distribution, marketing, and sale of Volkswagen and Audi products and is obligated to establish a network of authorized

---

[7] The scheme, which involved both the initial sale of vehicles and post-sale service tampering, was active from approximately May 2006 to November 2015.

[8] Audi is approximately 99.55% owned by VW Germany.

Volkswagen and Audi dealerships to carry out retail and after-sale services.

VW Germany and Audi (collectively, the German manufacturers) have separate "Importer Agreements" with VW America predating the Dieselgate misconduct; those agreements remain in force today, having been continuously renewed and amended on occasion. As a general proposition, neither of the German manufacturers has a contractual relationship with or direct control over any of the dealerships. Nor do they instruct VW America in the operations of the dealership network; that responsibility belongs exclusively to VW America.

But with regard to after-sale relationships with U.S. consumers, the Importer Agreements require (1) VW America to "establish, develop and maintain a competent, effective[,] and customer oriented after sales service to be provided through its [dealerships]" and (2) its dealerships "to perform campaign inspections and/or corrections for users of [the manufacturers' vehicles] including recall campaigns." "Upon notice of a recall or service campaign," which may be initiated *only* by the German manufacturers, "[VW America] *and/or* its [dealerships] shall" perform warranty repairs or maintenance service "in accordance with [the German manufacturers'] instructions, guidelines[,] and/or procedures."[9] These provisions of the Importer Agreements provide the German manufacturers with direct and indirect control over VW America and the dealerships for recall, warranty, and other service work.

As discussed in more detail below, after the initial sale of Affected Vehicles by VW America and its dealers, the German manufacturers

---

[9] Emphasis added.

actuated their retained control over recall and service work to further tamper with the emissions-control systems on those vehicles. The manufacturers' plot to circumvent environmental protection laws involved defeat devices installed both before and after the initial sale of Affected Vehicles, but this appeal concerns only the manufacturers' secondary tampering.

The entire scheme had its genesis in the enactment of stricter federal emissions standards in 1998. Although implementation of the new emissions standards occurred in phases, manufacturers were required to be in full compliance beginning with model year 2007 vehicles. VW Germany has stipulated that, around 2006, certain of its "supervisors" realized that the company "could not design a diesel engine that would both meet the stricter U.S. . . . emissions standards . . . and [also] attract sufficient customer demand in the U.S. market." So, rather than create and market "a diesel vehicle that could legitimately meet the new, more restrictive" standards, VW Germany and Audi contrived to deceive U.S. regulators and customers about the ability of more than a dozen Volkswagen and Audi models to comply with those standards.

To make it appear as if the Affected Vehicles met U.S. emissions standards when, in fact, they did not, VW Germany "designed, created, and implemented a software function to detect, evade and defeat U.S. emissions standards"—that is, an illegal defeat device.[10] VW Germany

---

[10] The original defeat-device technology incorporated in Volkswagen and Audi models with 2.0-liter engines functioned differently from the defeat-device technology in models with 3.0-liter engines, but because the post-sale tampering at issue here concerns only vehicle models with 2.0-liter

began by borrowing Audi's original concept of the "dual-mode, emissions cycle-beating software[.]" VW Germany's iteration of the software, which Audi tested for compatibility with its own vehicles, was designed "to recognize whether the vehicle was undergoing standard U.S. emissions testing" or was "being driven on the road under normal driving conditions." If the software detected that the vehicle was undergoing emissions testing, the vehicle performed in a mode that would satisfy U.S. emissions standards. If the software detected that the vehicle was not being tested, it operated in a different mode that reduced the effectiveness of its emission-control system and produced "substantially higher" emissions during normal driving conditions. Starting with model year 2009, the German manufacturers installed defeat devices or caused defeat-device technology to be installed in certain vehicles falsely marketed and sold in the United States as "clean diesel" and "environmentally friendly."

After a few years, Affected Vehicles throughout the United States began to develop hardware failures. These vehicles "were not designed to be driven for longer periods of time" in "testing mode," and VW Germany's engineers began to suspect that the defeat devices remained in test mode for too long, causing increased stress on the exhaust system. Over time, this caused the diesel particulate filter in Affected Vehicles to overheat and crack. The expensive repairs were covered by the manufacturers' warranties and executed by local

_____

engines, we confine our discussion to the development and implementation of that software and its updates.

9

Volkswagen and Audi dealerships in VW America's dealership network, including those in Texas.

Although VW America's dealerships were charged with making warrantied and recall repairs on Volkswagen and Audi vehicles, the Importer Agreements ultimately placed the financial burden of those repairs on the German manufacturers. The dealers paid the initial cost of warrantied and recall repairs, but VW America would reimburse the dealers for that work, and then, as required by the Importer Agreements, the German manufacturers would reimburse VW America. The German manufacturers, by practice, not by contract, made their reimbursement payments to VW America in the aggregate for costs incurred nationwide.

To reduce escalating warranty expenditures and further conceal the defeat devices, the German manufacturers conspired to install updated software in post-sale Affected Vehicles throughout the United States, including Texas. To make this happen, they took two actions. First, without disclosing the true purpose of the software updates, they initiated voluntary recalls of Affected Vehicles so that software "fixes" could be installed on each recalled vehicle.[11] Second, they arranged for the software to be updated when customers brought their cars in for normal maintenance, again without disclosing the true purpose of the updates.[12] To identify which cars should receive the updates,

---

[11] *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1208-09 (9th Cir. 2020) (recounting the facts stipulated in the plea agreement consistent with the record in this Court).

[12] *Id.*

10

VW Germany listed "in a specific system each and every VIN number of those vehicles that [were] affected by the recall." When targeted vehicles were brought into local dealerships—either in response to the recall or for other services—the software updates were installed via the German manufacturers' proprietary diagnostic system, which was designed for use on a worldwide basis. The software was available for these local updates via "automated download" after the manufacturers uploaded the updates to a "mirror server" in Germany that was "synchronized" with a "mirror server" VW America hosts in the United States. As soon as the software was available on VW America's server, the manufacturers' proprietary diagnostic system in each local dealership had access to it and would "transmit" it into targeted vehicles when presented for repair or service work. Before the German manufacturers uploaded the software to the mirror servers, VW America provided the manufacturers with a list of the dealers that would receive the updated software, which included dealers in Texas.

At no point was the true purpose of the updated software disclosed. Rather, "[i]n each scenario, the [German manufacturers] deceptively told [federal] regulators and American consumers that the software updates were intended to improve the operation of the [Affected] Vehicles."[13] All told, the initiative targeted 28,898 specifically identified Volkswagen and Audi vehicles in Texas, and of those targets, the post-sale tampering software was installed at Texas dealerships on 23,316 vehicles—a fact the German manufacturers do not dispute. For

---

[13] *Id.*

11

many of those vehicles, tampering occurred several years after the initial sale.[14]

The jig was up about eight years after the German manufacturers first conspired to ship Affected Vehicles to the United States. Around that time, an "independent study . . . revealed that certain Volkswagen vehicles emitted air pollutants at concentrations of up to approximately 40 times the permissible limit," causing the Environmental Protection Agency (EPA) to commence an investigation.[15] While the investigation was ongoing, and almost ten years after the deception's inception, a Volkswagen whistleblower informed federal regulators about the defeat devices. Under increasing pressure, the car companies came clean about the entire scheme.

The EPA pursued criminal charges against VW Germany for violating the federal Clean Air Act. VW Germany pleaded guilty to those charges and agreed to pay a criminal fine of $2.8 billion to the federal government. The EPA also filed a civil-enforcement action against the German manufacturers, VW America, and others. The civil claims were settled in a series of partial consent decrees that allocated $209 million to the State of Texas for environmental remediation, $1.45 billion in relief for Texas consumers, and more than $92 million to compensate Texas dealers.[16] According to counsel for the German

---

[14] Post-sale tampering generally occurred from 2014 to 2016 with Affected Vehicle models dating back to 2009. Of the vehicles receiving the software updates, 487 were Audi models.

[15] *Id.* (internal quotation marks omitted).

[16] *Volkswagen Aktiengesellschaft v. State*, Nos. 03-19-00453-CV, 03-20-00022-CV, ___ S.W.3d ___, 2020 WL 7640037, at *2 (Tex. App.—Austin

manufacturers, "Texas and its residents stand to recover more than $1.35 billion from the federal actions."[17]

Notably, neither the plea agreement nor the consent decrees gave the German manufacturers any express protection from similar lawsuits by state or local governments. "To the contrary, each state expressly reserved its ability to sue Volkswagen for damages,"[18] and the State of Texas did just that.

Initially, the State filed an environmental-enforcement action against only VW America, Audi of America,[19] and Porsche Cars North America, Inc. (collectively, the American defendants), asserting violations of the Texas Clean Air Act and environmental regulations and seeking civil penalties and injunctive relief. After several Texas counties did the same, the lawsuits were transferred to a multidistrict litigation (MDL) pretrial court. In these proceedings, the parties refer to claims based on the original "factory installation of defeat devices" on

---

Dec. 22, 2020) (*Volkswagen AG*). The extent of the German manufacturers' total liability resulting from the federal proceedings is unclear, but it exceeds $20 billion, including the $2.8 billion fine. *See Volkswagen "Clean Diesel" Mktg.*, 959 F.3d at 1209.

[17] *See Volkswagen AG*, ___ S.W.3d at ___, 2020 WL 7640037, at *2. Counsel made the same representation to this Court.

[18] *Volkswagen "Clean Diesel" Mktg.*, 959 F.3d at 1209 & n.10.

[19] Audi of America is a wholly owned subsidiary of VW America. According to the record, the entity is "used for accounting purposes[] and is not engaged in the import or distribution of Audi vehicles. Audi vehicles are sold to authorized Audi dealers in the United States by VW America under the trade name . . . 'Audi of America, Inc.' No subsidiary of Audi is involved in the import or distribution of Audi vehicles in the United States."

13

Affected Vehicles as "original tampering" claims.[20] They use the term "recall tampering" to describe the "allegations that after the [A]ffected [V]ehicles had been sold to consumers, the [German and American] entities tampered with those vehicles through software updates to the defeat devices that were installed at dealerships as part of nationwide recall campaigns or when cars were brought in for servicing."[21]

Before the State sued the German manufacturers, the American defendants moved for summary judgment, arguing that the federal Clean Air Act preempts claims under the Texas Clean Air Act. The State filed a response in opposition to the summary-judgment motion and, on the same day, added VW Germany and Audi as defendants in the lawsuit. Shortly thereafter, the American defendants once again moved for summary judgment based on preemption.[22] The trial court granted summary judgment as to the original-tampering claims but denied it as to the recall-tampering claims.

The German manufacturers filed special appearances contesting personal jurisdiction in Texas with respect to the after-sale recall- and service-tampering claims, which were the only live claims remaining at that time.[23] The parties conducted discovery directed to the

---

[20] *Volkswagen AG*, ___ S.W.3d at ___, 2020 WL 7640037, at *2.

[21] *Id.* at *3.

[22] The record does not reflect that the trial court ever ruled on the first summary-judgment motion.

[23] *See* TEX. R. CIV. P. 120a. The State's Fourth Amended Petition, to which the German manufacturers filed their First Amended Special Appearance and First Amended Answer, alleges violations of the following: TEX. HEALTH & SAFETY CODE § 382.085(b) (Texas Clean Air Act's prohibition

14

jurisdictional issue, and after separate hearings without live testimony, the trial court denied the special appearances. No findings of fact or conclusions of law were requested or provided, so in this opinion, we recount the evidence in the light most favorable to the trial court's jurisdictional ruling, as we must.[24]

Having lost on their jurisdictional challenges, the German manufacturers perfected separate interlocutory appeals, which the court of appeals consolidated for consideration.[25] By then, the State had ostensibly abandoned any argument that the German manufacturers were subject to general jurisdiction in Texas. With the inquiry narrowed to whether Texas courts may exercise specific jurisdiction over VW Germany and Audi, a divided court of appeals reversed the trial court's order and dismissed the claims against the German manufacturers.[26]

In finding personal jurisdiction lacking, the majority concluded that VW Germany and Audi had not purposefully availed themselves of the privilege of conducting activities in Texas because "[a]t most, the evidence in the record establishes that [they] directed recall-tampering

---

on unauthorized emissions); TEX. WATER CODE §§ 7.101–.102 (penalty statutes for violating the Texas Clean Air Act and environmental regulations); TEX. WATER CODE § 7.032 (statute authorizing injunctive relief for violating the Texas Clean Air Act and environmental regulations); and 30 TEX. ADMIN. CODE § 114.20(b), (e) (motor vehicle anti-tampering regulations). This petition was the live pleading when the trial court ruled on the special appearances.

[24] *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794-95 (Tex. 2002).

[25] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7).

[26] *Volkswagen AG*, ___ S.W.3d at ___, 2020 WL 7640037, at *1.

conduct toward the United States as a whole, not to Texas specifically."[27] The dissent would have held that the German manufacturers are subject to personal jurisdiction in Texas because even though they directed their after-sale tampering "to the United States as a whole," they necessarily directed those activities to Texas as well.[28] "To hold otherwise," opined the dissent, "is to hold that by targeting every state, a foreign manufacturer is not accountable in any state."[29]

After consolidating the VW Germany and Audi cases for briefing, we granted the State's petitions for review to consider, among other things, whether a foreign defendant can be subject to specific jurisdiction in this forum when its contacts with Texas are undifferentiated from its contacts with other states.

## II. Discussion

Texas courts may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute so provides and (2) the exercise of jurisdiction "is consistent with federal and state due process guarantees."[30] "Our long-arm statute reaches as far as the federal constitutional requirements for due process will allow,"[31] so Texas courts

---

[27] *Id.* at *5.

[28] *Id.* at *10 (Triana, J., dissenting).

[29] *Id.*

[30] *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

[31] *Id.* (internal quotation marks omitted); *see BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (the long-arm statute "extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit[, so] we rely on precedent from the United States Supreme Court and other federal courts, as well as our own

16

may exercise personal jurisdiction over foreign defendants "having such 'contacts' with the forum [s]tate that 'the maintenance of the suit' is 'reasonable[] in the context of our federal system of government' and 'does not offend traditional notions of fair play and substantial justice.'"[32] This "minimum contacts" inquiry is a "forum-by-forum" or "sovereign-by-sovereign"[33] analysis that examines "the nature and extent of 'the defendant's relationship to the forum'"[34] to determine whether the defendant is amenable to general or specific jurisdiction.[35]

General jurisdiction—which is not alleged here—arises when a defendant's contacts with the forum state are so "continuous and systematic" that the defendant is "essentially at home."[36] This kind of personal jurisdiction allows courts to render a binding judgment against a defendant even if the plaintiff's claims neither arise from activities

---

State's decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction" (internal quotation marks and citations omitted)); *see also* TEX. CIV. PRAC. & REM. CODE § 17.042 (Texas long-arm statute).

[32] *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316-17 (1945)); *see Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) ("[F]ederal due process requirements shape the contours of Texas courts' jurisdictional reach[.]").

[33] *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion); *accord Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 10 (Tex. 2021) (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 779-80 (1984)).

[34] *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Calif., S.F. Cnty.*, 137 S. Ct. 1773, 1779 (2017)).

[35] *E.g.*, *Spir Star AG*, 310 S.W.3d at 872.

[36] *E.g.*, *Luciano*, 625 S.W.3d at 8; *Searcy*, 496 S.W.3d at 72.

conducted in the forum state nor "relate to the forum [s]tate or the defendant's activity there."[37]  Under general-jurisdiction principles, the cause of action "may concern events and conduct anywhere in the world," subject to certain "correlative limit[s]."[38]

"Specific jurisdiction is different: It covers defendants less intimately connected with [the forum state], but only as to a narrower class of claims."[39]  Courts can exert specific jurisdiction over a nonresident defendant when (1) the defendant engages in "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum [s]tate" and (2) the plaintiff's claims "arise out of or relate to" those forum contacts.[40]  This kind of personal jurisdiction involves a "claim-by-claim"[41] analysis that focuses on the relationship between the defendant, the forum state, and the operative facts of the litigation.[42]

A court's authority to exercise jurisdiction over a nonresident defendant is a question of law we review de novo.[43]  If the plaintiff meets

---

[37] *Ford Motor Co.,* 141 S. Ct. at 1024.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 1024-25 (2021) (alteration in original) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958), and *Bristol-Myers,* 137 S. Ct. at 1780); *see Luciano,* 625 S.W.3d at 8-9.

[41] *Moncrief Oil Int'l Inc. v. OAO Gazprom,* 414 S.W.3d 142, 150 (Tex. 2013).

[42] *Id.*

[43] *E.g., Spir Star AG v. Kimich,* 310 S.W.3d 868, 871 (Tex. 2010); *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002).

its initial burden to plead allegations sufficient to confer personal jurisdiction, the burden shifts to the defendant to negate all jurisdictional bases alleged.[44] "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence."[45] "If the parties present conflicting evidence that raises a fact issue, we will resolve the dispute by upholding the trial court's determination."[46]

The controlling issue in this appeal is whether the relevant facts give rise to specific jurisdiction over the German manufacturers. Primarily, the parties debate whether the foreign defendants have any contacts with Texas at all and, if so, whether those contacts satisfy the "purposeful availment" requirement. The German manufacturers essentially concede that, if minimum contacts exist, the exercise of specific jurisdiction would comport with traditional notions of fair play and substantial justice.[47]

## A. Purposeful Availment

"The 'touchstone of jurisdictional due process' is 'purposeful availment.'"[48] "At its core, the purposeful availment analysis . . .

---

[44] *BMC Software*, 83 S.W.3d at 793; *see TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016) (describing the burden-shifting process).

[45] *Moncrief Oil*, 414 S.W.3d at 150.

[46] *TV Azteca*, 490 S.W.3d at 36 n.4.

[47] *See Moncrief Oil*, 414 S.W.3d at 154-55 ("If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice.").

[48] *TV Azteca*, 490 S.W.3d at 45 (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005)).

determine[s] whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there."[49] Whether a nonresident defendant has "purposefully availed itself of the privilege of conducting activities in Texas" is guided by three considerations:

- "[O]nly the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person";

- "The contacts relied upon must be purposeful," not "random, fortuitous, or attenuated"; and

- The defendant "must seek some benefit, advantage[,] or profit by availing itself of [Texas's] jurisdiction."[50]

"This analysis assesses the quality and nature of the contacts, not the quantity."[51]

The two somewhat novel purposeful-availment issues we consider here are: (1) whether the German manufacturers are accountable for forum-state contacts effectuated through legally distinct intermediaries that were acting at the German manufacturers' direction and under their contractual control with respect to the recall and service campaigns; and (2) whether directing the same activity at multiple states negates purposeful availment of an individual state absent other, more differentiated, conduct directed to that forum. We resolve both issues favorably to the trial court's jurisdictional ruling and hold that the German manufacturers' after-sale recall- and service-tampering

---

[49] *Moncrief Oil*, 414 S.W.3d at 152.

[50] *Id.* at 151.

[51] *Id.*

activities give rise to sufficient minimum contacts to sustain specific personal jurisdiction.[52]

## B. Minimum Contacts

Citing our decisions in *Spir Star AG v. Kimich*[53] and *Luciano v. SprayFoamPolymers.com, LLC*,[54] the State argues that, despite lacking a physical presence in Texas, the German manufacturers conducted activities in Texas that are sufficient to sustain the exercise of specific personal jurisdiction. The State does not rely on alter ego or veil-piercing theories to fuse the German manufacturers with VW America or the local dealerships. Instead, the State asserts that the German manufacturers affirmatively used their control over VW America and its local dealerships to carry out after-sale recall- and service-tampering campaigns in Texas that violated our laws and, in doing so, established contacts with Texas that are directly attributable to the foreign defendants. These contacts, the State says, are no mere fortuity but rather an orchestrated and intentional scheme, and because the contacts were made at the German manufacturers' behest and under their direction, they do not derive from the unilateral activity of VW America, the local dealerships, the State, or its residents. Arguing to the contrary, the German manufacturers contend that the State has not shown that the German manufacturers themselves, as opposed to

---

[52] Although the State argues that sufficient "plus" factors exist even as to the initial sales, we need not consider that argument.

[53] 310 S.W.3d 868 (Tex. 2010).

[54] 625 S.W.3d 1 (Tex. 2021).

VW America, have "specifically targeted" Texas or taken any steps purposefully directed towards the Texas market.

We agree with the State that the German manufacturers have established contacts with Texas by using their direct contractual control over VW America and their direct and indirect contractual control over the dealerships. The German manufacturers structured their business relationships so that neither VW America nor the dealerships had control over how the Affected Vehicles were modified by the software updates that occurred inside this state. The record bears evidence that:

- The German manufacturers had the sole authority to initiate and direct after-sale recall and service campaigns;

- The German manufacturers used that authority to initiate and direct recall and service tampering of specifically identified vehicles that were owned, operated, and serviced in Texas;

- VW Germany developed the tampering software based on Audi's original design; Audi contributed to the connivance and software development by testing the updates for compatibility with Audi cars; both manufacturers caused the defeat-device software to be uploaded to "mirror servers" that "automated" downstream delivery to the point of installation in Texas; and before deploying the software to the mirror servers, both manufacturers knew which local dealerships would receive the updates;

- The software was installed in Texas vehicles using the German manufacturers' proprietary diagnostic system;

- VW America was contractually required to perform recall and service campaigns, and it did so, at the manufacturers' directive and in accordance with their instructions;

- VW America claims that it was an unwitting dupe that knew nothing about either the original tampering or the recall and service tampering, but whether that is true or not, the record

22

bears evidence that its servers were a mere conduit for passing the manufacturers' software updates through to the local dealerships;

- As mandated by the Importer Agreements, VW America caused its dealerships to install the software updates on behalf of and at the initiation, direction, and instruction of the German manufacturers;

- As mandated by the Importer Agreements, #Texas dealerships installed the software updates in the targeted vehicles in accordance with the manufacturers' instructions;

- VW Germany supplied, and Audi approved, false messaging about the purpose of the recalls and software updates, which VW America was obligated to disseminate to dealerships and customers, including those in Texas;[55] and

- The German manufacturers reimbursed the local dealers, by and through VW America, for the manufacturer-mandated after-sale services physically rendered to customers in Texas.

While personnel at VW America's Texas dealerships may have "clicked the button" to download the tampering software to the Affected Vehicles, the process was essentially put into unstoppable motion by the manufacturers and did not derive from unilateral or independent action of VW America, the dealerships, or their customers. By directing an affiliated importer/distributor to carry out the recall and service

---

[55] VW America drafted letters to customers, as well as "documents that would communicate the change or the field fix to the dealerships," but information in the customer letter came from a campaign data sheet VW Germany prepared. For example, in one customer letter, in answer to the question "What is the issue, and what will we do?", VW Germany provided text falsely stating that "the vehicle engine's management software has been improved to assure your vehicle's tailpipe emissions are optimized and operating efficiently—well beyond given government standards."

campaigns—knowing the importer/distributor and the local dealerships were contractually obligated to do so when, as, and how instructed—the German manufacturers purposefully availed themselves of the Texas market to consummate their illegal scheme.

Whether the German manufacturers' purposeful actions are characterized as direct or indirect contacts with Texas is, as the State's counsel put it, a "metaphysical" distinction without a difference to the outcome of this case.[56] The personal-jurisdiction analysis does not depend on "mechanical tests" but on a qualitative assessment of any relevant conduct demonstrating purposeful availment.[57] If, as all agree, the core inquiry is whether the German manufacturers could reasonably anticipate being haled into a Texas court, that standard is met in this unprecedented case based on evidence of (1) the German manufacturers' intentional conduct; (2) their knowing use of an established and preexisting distribution system—which they controlled in the relevant way—to bring their jointly developed software to Texas to alter the

---

[56] *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 874 (Tex. 2010) ("[P]urposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates or independent distributors).").

[57] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("The Court long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests."); *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945) ("[T]he criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. . . . Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.").

Affected Vehicles post-sale; (3) the "automated download" of the software through a conduit server for installation on targeted Texas vehicles; and (4) use of the manufacturers' proprietary diagnostic system to install the software in Texas. The purposefulness of those forum contacts is not diminished in any way by the pervasiveness of the manufacturers' recall-tampering scheme.

### 1. The German Manufacturers' Contacts

The notion that a defendant may submit to a forum's jurisdiction without physically entering the forum state is, of course, "unexceptional."[58] A paradigmatic example is when "manufacturers or distributors 'seek to serve' a given [s]tate's market."[59] In such circumstances, courts often rely on "metaphors" as proxies for the purposeful-availment inquiry.[60] In this case, the State asserts that the German defendants are amenable to jurisdiction in Texas under a "stream-of-commerce-plus" theory[61] and also based on purposeful conduct designed to obstruct state law.[62] We find both concepts informative.

Under a stream-of-commerce-plus framework, "'a nonresident who places products into the "stream of commerce" *with the expectation*

---

[58] *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (plurality opinion).

[59] *Id.*

[60] *Id.* at 881-82.

[61] *See Spir Star*, 310 S.W.3d at 873 (explaining that our precedent generally follows this stream-of-commerce-plus theory).

[62] *See Nicastro*, 564 U.S. at 880 (plurality opinion) ("As a general rule, the sovereign's exercise of power requires some act by which the defendant

*that they will be sold in the forum state*' may be subject to personal jurisdiction in the forum."[63]  In contrast, *mere foreseeability* that a product might ultimately end up in a particular forum does not alone constitute purposeful availment.[64]  When the stream of commerce only fortuitously deposits a product in the forum state, a nonresident manufacturer will be subject to the forum's jurisdiction only if additional conduct—often referred to as a "plus factor"—evinces the manufacturer's intent to serve that market.[65]  This analytical construct is frequently used in products-liability cases to determine whether specific jurisdiction exists.[66]  When a nonresident manufacturer has no knowledge, care, or control over where a product ends up, this and other courts require some "plus factor" to establish purposeful availment. Examples include "marketing the product through a distributor who has agreed to serve as the sales agent in the forum [s]tate" or "creating,

---

'purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws,' though in some cases, as with an intentional tort, the defendant might well fall within the [s]tate's authority by reason of his attempt to obstruct its laws." (citations omitted) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958))).

[63] *TV Azteca v. Ruiz*, 490 S.W.3d 29, 46 (Tex. 2016) (emphasis added) (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576-77 (Tex. 2007)).

[64] *E.g., CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996) ("[F]oreseeability alone will not support personal jurisdiction.  The defendant must take an action '*purposefully directed* toward the forum state' to be subject to the jurisdiction of its courts." (emphasis added) (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987) (plurality opinion))).

[65] *Asahi*, 480 U.S. at 112 (plurality opinion).

[66] *E.g., CMMC v. Salinas*, 929 S.W.2d 435, 440 (Tex. 1996).

controlling, or employing the distribution system that brought the product into the forum state."[67]

Unlike the initial sales of Affected Vehicles, which might invoke the stream-of-commerce-plus framework, this case does not involve a typical stream-of-commerce scenario. With respect to the recall-tampering claims at issue here, Affected Vehicles were already in Texas when the German defendants reached in to modify those vehicles in ways that allegedly violate state law. But even though this is not a stream-of-commerce case, "plus" factors we have recognized are informative and strikingly similar to how the German manufacturers' defeat-device software updates and recall and service messaging were brought to Texas dealers and consumers.

In *Spir Star*, a products-liability case, we employed a stream-of-commerce-plus analysis in holding that a foreign manufacturer was amenable to specific jurisdiction in Texas because it had marketed its product through an independent distributor who "agreed to serve as the sales agent" in Texas.[68] We observed that, "[j]ust as manufacturers cannot escape liability for defective products by selling them through a subsidiary or distributor, neither can they avoid jurisdiction related to such claims by the same means."[69]

---

[67] *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 10, 12 (Tex. 2021).

[68] *Spir Star AG v. Kimich*, 310 S.W.3d 868, 875 (Tex. 2010) ("[B]y 'marketing [its] product through a distributor who has agreed to serve as the sales agent in the forum state,' [the manufacturer] has met [the] 'additional conduct standard.'").

[69] *Id.*

Likewise, in *Luciano*, we held that an out-of-state manufacturer was subject to specific jurisdiction in Texas because it employed an independent-contractor sales agent who served as the manufacturer's "boots on the ground" in marketing and selling its products in Texas.[70] In finding specific jurisdiction existed over the out-of-state manufacturer, the "quality and nature" of the salesman's role evinced the defendant's "'intent or purpose' to target the Texas market."[71] As in *Spir Star*, our holding in *Luciano* affirms that acting through a "distributor-intermediary" or an agent with "boots on the ground" to intentionally target Texas as the marketplace for a product "provides no haven from the jurisdiction of a Texas court."[72]

Analogous conduct happened here, and the same result obtains. The plain and express terms of the Importer Agreements grant the German manufacturers control over both VW America and its network of dealerships, including those in Texas, for purposes of carrying out recall and service campaigns. Neither VW America nor the dealerships had discretion to initiate or refuse to implement a recall or service campaign. When the German manufacturers initiated those campaigns, VW America was required to fall in line at their say-so and to compel the dealerships to do the same. Indeed, the German manufacturers have admitted that they had the exclusive prerogative to institute a recall.

---

[70] 625 S.W.3d at 12.

[71] *Id.*

[72] *Id.*; *Spir Star*, 310 S.W.3d at 871.

28

Importantly, the Importer Agreements also specifically and directly compel local Volkswagen and Audi dealerships to perform recall and service campaigns "in accordance with [the German manufacturers'] instructions, guidelines[,] and/or procedures."[73] Although the German manufacturers' software updates and instructions for conducting the after-sale tampering may have passed to the dealerships through VW America, that circumstance did not displace the German manufacturers' actual and contractual control over the entire scheme and each level of the distribution stream. Consistent with the terms of the Importer Agreements and the testimony of VW Germany's corporate representative, VW America's corporate representative described the subsidiary as a mere "passthrough department given information by [VW Germany]" about recall and service campaigns, noting the company provided required signatures for relevant documents without always having the information necessary to ascertain whether the documents' contents were true and correct. After developing the software updates and deploying them for downstream delivery, the German manufacturers used the dealerships as their "boots on the ground" for after-sale recall- and service-campaign purposes in two ways: (1) by issuing directives, instructions, and

---

[73] The Importer Agreements do not distinguish between the German manufacturers' control over VW America and its "Contractual Enterprises," requiring that "[VW America] *and/or* its Contractual Enterprises shall [perform], in accordance with [the German manufacturers'] instructions, guidelines[,] and/or procedures . . . warranty repairs and/or service and repair Contractual Products." (Emphasis added.) The agreements define "Contractual Enterprises" as the dealers authorized to distribute, sell, or service the manufacturers' vehicles.

procedures that both VW America and the dealerships were contractually obligated to obey and (2) by providing the proprietary diagnostic system through which each Texas dealership downloaded and installed the tampering software into Affected Vehicles.[74]

We acknowledge, as we must, that parent and subsidiary corporations are presumed to be separate from one another.[75] Accordingly, to "ascribe one corporation's actions to another by disregarding their distinct corporate entities" or to "'fuse' the parent company and its subsidiary for jurisdictional purposes, the plaintiff[] must prove the parent controls the internal business operations and

---

[74] *See Luciano*, 625 S.W.3d at 12 (noting the "reality" that the foreign manufacturer had taken purposeful steps to "tap[] into the local market" using an independent "sales agent" as its "boots on the ground"); *see also, e.g.*, *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 691 (Tex. 2017) (explaining that an agency relationship exists if the agent has consented to act on the principal's behalf and subject to the principal's control and the principal has authorized the agent to act on his behalf); *Wilburn v. Valliance Bank & Coleman & Patterson LLC*, No. 05-14-00965-CV, 2015 WL 9281271, at *3 (Tex. App.—Dallas Dec. 21, 2015, no pet.) (mem. op.) (observing that "[a]n agency relationship is created" under an actual-authority theory "when the principal: (1) intentionally confers authority on the agent; (2) intentionally allows the agent to believe he has authority; or (3) allows the agent to believe that he has authority to act by lack of due care" on the principal's part); *Gonzales v. Am. Title Co. of Hous.*, 104 S.W.3d 588, 593 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("An agent is a person or entity who (1) is authorized to act for another and (2) is subject to the control of the other.").

[75] *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002); *see Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) ("Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent–subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent."); *id.* at 1161 (explaining that a Texas parent company's contacts could not be imputed to the foreign subsidiary because the subsidiary and parent maintained "a degree of corporate separation that was more than superficial").

affairs of the subsidiary" to a degree "greater than that normally associated with common ownership and directorship."[76]

In this case, however, we need not disregard corporate separateness or fuse the intermediaries with the German manufacturers based on alter ego or any other veil-piercing theory to give effect to the contractual relationship the parties designed with regard to the specific mechanism by which the wrongful conduct occurred in Texas. The German manufacturers' control over the entire scheme—control granted and exercised by them under the Importer Agreements—allowed them to perpetrate a fraud on this state and its citizens under the guise of recall and service campaigns. While the German manufacturers could have organized their business relationships to insulate themselves from forum-state contacts, they did not do so with respect to the actions that form the basis of the State's claims here. They cannot now use their mere passthrough department as a "haven from the jurisdiction of a Texas court."[77]

## 2. Purposeful, Not Fortuitous

This brings us to the question of whether the German manufacturers can avoid personal jurisdiction in Texas merely because the after-sale tampering activities they controlled were part of a

---

[76] *BMC Software*, 83 S.W.3d at 798-99. "[T]he evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *Id*. at 799.

[77] *Spir Star*, 310 S.W.3d at 871, 874 ("The issue is not . . . whether [the subsidiary's] actions in Texas can be imputed to [the foreign parent company]. Rather, our concern is with [the parent's] own conduct directed toward marketing its products in Texas.").

nationwide effort to cause local dealerships to install the defeat-device software in all targeted vehicles after-sale.

As a necessary corollary to the principle that jurisdiction exists only when the defendant's forum contacts are purposeful, contacts that are "random, isolated, or fortuitous" are not sufficient to hale a nonresident defendant into the jurisdiction.[78] In other words, for Texas courts to exercise specific jurisdiction over the German manufacturers, their contacts with Texas cannot be accidental, mere happenstance, or simply foreseeable.

Here, there was no happenstance to the contacts with Texas; rather, the German manufacturers' conduct reflects an intent to avail themselves of every market Affected Vehicles were in at the time of the recall and service campaigns—including Texas. The targets were already here, so the German manufacturers had to direct their conduct here to accomplish their mission. And because "personal jurisdiction requires a forum-by-forum" analysis,[79] we look only to the German manufacturers' behavior directed toward Texas, not their behavior directed elsewhere.[80] The logical consequence is that the lack of differentiation in the nature and kind of conduct directed at other jurisdictions does not negate the German manufacturers' purposeful availment of this one.

---

[78] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).

[79] *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion).

[80] *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 10 (Tex. 2021).

The defendant need not single Texas out in some unique way to satisfy constitutional dictates. To hold that a nonresident who has directed activity to *every* state is not amenable to jurisdiction in *any* state would unduly constrain the authority of state courts to hold nonresidents accountable for their in-state conduct and would convert the specific-personal-jurisdiction analysis into a wholly subjective inquiry into the defendants' state of mind.[81] The potential ramifications prove the fallacy of the German manufacturers' "nationwide targeting" argument with respect to wrongful conduct that actually occurred in Texas. For example, if a malfunction in the defeat-device software updates had caused a Texas car owner to suffer personal injuries in Texas, the German manufacturers' jurisdictional theory would leave plaintiffs with no avenue of redress in *any* jurisdiction because *none* would have jurisdiction despite—and indeed *because of*—the automakers' pervasive scheme. The state tort claims also could not be brought in any federal court because jurisdiction there depends on jurisdiction in the forum state.[82] Neither the federal nor the state

---

[81] *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 147 (Tex. 2013) ("[W]hat the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts. Regardless of the defendants' subjective intent, their Texas contacts are sufficient to confer specific jurisdiction over the defendants.").

[82] *See, e.g.*, *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242 (5th Cir. 2008) ("A federal district court has personal jurisdiction over a nonresident defendant to the same extent as a state court in the state in which the district court is located."); *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995) ("It is well established in diversity cases that the district court's personal jurisdiction over a nonresident defendant is governed by the forum's long-arm statute." (internal quotation marks omitted)); *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1416 (10th Cir. 1988) (observing that, in diversity cases, a

constitution requires us to adopt a rule insulating nonresident defendants from personal jurisdiction arising from or related to their Texas-based contacts merely because the defendant has targeted other states in a similar manner. Rather, the critical inquiry is whether a nonresident defendant has established sufficient contacts with Texas—not whether those contacts are materially different from its contacts with other states.

Our recent decision in *Luciano* bears this out. There, the nonresident defendant had a greater number of contacts with Connecticut than it had with Texas: it was formed, had its principal place of business, "accept[ed] customers' orders, approve[d] and processe[d] orders, employ[ed] personnel, and receive[d] payment" in Connecticut, while it merely sent a sales agent to Texas.[83] Nonetheless, we rejected the defendant's argument that "its numerous contacts with Connecticut ma[d]e specific jurisdiction in Texas improper."[84] "[T]he contacts an entity forms with one jurisdiction do not negate its purposeful contacts with another."[85] So too here: the fact that the German manufacturers have contacts with other states or the United States as a whole does not preclude them from having jurisdictionally significant contacts with Texas.

---

federal court cannot exceed the jurisdictional reach of the courts of the forum in which they sit); FED. R. CIV. P. 4(k) (providing the process for acquiring personal jurisdiction in diversity cases).

[83] *Luciano*, 625 S.W.3d at 7, 10 n.2.

[84] *Id.* at 10.

[85] *Id.* (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 779-80 (1984)).

Our conclusion that differentiation among states is not required for personal jurisdiction is supported by the United States Supreme Court's hallmark personal-jurisdiction decision in *Keeton v. Hustler Magazine, Inc.*[86] and is consistent with our personal-jurisdiction precedent.

In *Keeton*, the defendant publisher distributed its magazine nationwide.[87] The Supreme Court nonetheless held that the forum state could exercise personal jurisdiction over the defendant, and it did so without regard to whether the defendant had availed itself of the forum in a way that was distinct from its availment of other jurisdictions.[88] The "circulation of magazines in the forum [s]tate [was] sufficient to support an assertion of jurisdiction" without any consideration of whether the extent of circulation was materially different from its distribution throughout the United States.[89]

The sole focus in *Keeton* was on the forum-state contacts, with the Supreme Court holding that "some 10 to 15,000 copies" of the magazine sold in the forum state each month could not "by any stretch of the imagination be characterized as random, isolated, or fortuitous."[90] Considering only the forum contacts, the Court viewed this as evidence that the defendant "chose to enter the [forum state's] market" and found

---

[86] 465 U.S. 770 (1984).

[87] *Id.* at 774.

[88] *See id.* at 775-81.

[89] *Id.* at 773.

[90] *Id.* at 772, 774.

it "sufficient to support an assertion of jurisdiction."[91]   In this case, Volkswagen and Audi dealerships in Texas—acting as the German manufacturers' cat's paw[92]—performed recall or service actions on 23,316 specifically identified Affected Vehicles.  Thousands of contacts are certainly not isolated—indeed, a regular flow of activity continued throughout the roughly two-year recall-tampering period.[93]

Nor were these contacts random or fortuitous.  Even if the German manufacturers were not subjectively focused on Texas to the exclusion of other jurisdictions, their contacts reflect both an expectation that the software updates would be deployed in Texas and a clear choice to enter the Texas market where a substantial number of targeted vehicles would be serviced.  As we have explained, "what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts."[94]  Rather, "the business contacts needed for specific personal jurisdiction over a nonresident defendant 'are generally a matter of physical fact.'"[95]  Accordingly, we do not concern ourselves with whether,

---

[91] *Id.* at 773-74, 779.

[92] Colloquially, a "cat's paw" is "one used by another as a tool," "a person used by another to do dangerous, distasteful, or unlawful work," and a "dupe." MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/cat%27s-p aw (last visited May 3, 2023); COLLINS https://www.collinsdictionary.com/us/ dictionary/english/ cats-paw (last visited May 3, 2023).

[93] Although only 487 were Audi models, that remains a significant number of purposeful contacts.

[94] *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 147 (Tex. 2013).

[95] *Id.* (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005)).

in directing VW America to carry out the recall and service campaigns, the German manufacturers had Texas on their corporate minds.

The analysis in the Supreme Court's plurality opinion in *J. McIntyre Machinery, Ltd. v. Nicastro*[96] does not compel a different result. *Nicastro*, which we have cited for general propositions on a handful of occasions, is factually and analytically distinguishable. *Nicastro* is a products-liability case in which the United States Supreme Court—in plurality and concurring opinions—concluded that a foreign manufacturer had not purposefully availed itself of the New Jersey market despite its intent, desire, and hope to serve the entire U.S. market.[97] In concluding that personal jurisdiction over the defendant did not lie in New Jersey under a stream-of-commerce analysis,[98] a majority of the Court rejected the lower court's ruling that a forum could "exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.'"[99] In the plurality's view, the jurisdictional inquiry implicated two principles: (1) "personal jurisdiction requires a forum-by-forum, or

---

[96] 564 U.S. 873 (2011) (plurality opinion).

[97] *Id.* at 886.

[98] *Id.* at 887.

[99] *Id.* (quoting *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d 575, 592 (N.J. 2010), *rev'd*, 564 U.S. 873 (2011)); *id.* at 890-91 (Breyer, J., concurring) (quoting the same).

sovereign-by-sovereign, analysis,"[100] and (2) in theory, a defendant "may be subject to the jurisdiction of the courts of the United States but not of any particular [s]tate" "[b]ecause the United States is a distinct sovereign."[101]

The plurality framed the jurisdictional question as "whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."[102]  And given the necessity of a forum-specific analysis, the plurality found it irrelevant that the defendant "directed marketing and sales efforts at the United States" because "the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is [the manufacturer's] purposeful contacts with New Jersey, not with the United States, that alone are relevant."[103]  The claim of jurisdiction in *Nicastro* rested on facts the plurality said "may reveal an intent to serve the U.S. market, but they do not show that [the manufacturer] purposefully availed itself of the New Jersey market."[104] The plurality opinion explains:

> Respondent's claim of jurisdiction centers on three facts:
> [t]he [independent] distributor agreed to sell [the

---

[100] *Id.* at 884 (plurality opinion); *accord id.* at 891 (Breyer, J., concurring) (noting that the established jurisdictional inquiry is whether "it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there").

[101] *Id.* at 884.

[102] *Id.*

[103] *Id.* at 885-86.

[104] *Id.* at 886.

38

manufacturer's] machines in the United States; [the manufacturer's] officials attended trade shows in several States but not in New Jersey; and up to four machines ended up in New Jersey. The British manufacturer had no office in New Jersey; it neither paid taxes nor owned property there; and it neither advertised in, nor sent any employees to the State. Indeed, after discovery the trial court found that the "defendant does not have a single contact with New Jersey short of the machine in question ending up in this state."[105]

The German manufacturers suggest that the *Nicastro* plurality opinion precludes consideration of forum contacts if the nonresident defendant has targeted the U.S. market generally. This argument misreads *Nicastro*, which presents the inverse scenario. Properly construed, *Nicastro* reaffirms the forum-by-forum personal-jurisdiction analysis.[106] The plurality repudiated the lower court's aggregation of nationwide contacts and attribution of those contacts to a particular state based on the foreign manufacturer's desire to penetrate the entire U.S. market and the mere foreseeability that its products could end up in any of the fifty states.[107] The situation there was the opposite of the circumstances here, where the German manufacturers essentially seek to *negate* forum contacts based on their similar contacts elsewhere.

*Nicastro* is further inapposite because, here, the German manufacturers' conduct rises above mere foreseeability. In both *Nicastro* and the instant cases, legally distinct distributors

---

[105] *Id.*

[106] *Id.* at 884.

[107] *See id.* at 879, 886.

independently marketed and sold the foreign defendants' products throughout the United States, and the foreign defendants had never established a physical presence in the forum state. But in *Nicastro*, the sale of one to four products through an independent distributor had been the extent of the forum activity. Although foreseeability is a factor in a stream-of-commerce-plus analysis, mere foreseeability that a product sold in the United States might end up in a particular forum state is not enough to subject the defendant to that state's jurisdiction.[108] A defendant who places a product into the stream of commerce can be charged only with foreseeing that the product *might* end up in the forum state, and such foreseeability is not evidence of the purposefulness required to "invok[e] the benefits and protections" of a forum's laws or take advantage of its market.[109] That is why we and courts around the country require "plus" factors in products-liability cases—to delineate purposeful action directed at the forum state.[110] The *Nicastro* manufacturer might have foreseen—and even hoped—that its machines would be sold in New Jersey, but the Supreme Court discerned no evidence of additional conduct indicating the foreign defendant's intent

---

[108] *E.g.*, *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996) ("[F]oreseeability alone will not support personal jurisdiction. The defendant must take an action '*purposefully directed* toward the forum state' to be subject to the jurisdiction of its courts." (emphasis added) (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987) (plurality opinion))).

[109] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

[110] *See, e.g.*, *CSR Ltd.*, 925 S.W.2d at 595.

to exploit the New Jersey market in connection with the initial sale of products through a distributor.[111]

In contrast to the circumstances in *Nicastro*, the after-sale recall and service campaigns initiated at the German manufacturers' direction on specifically identified vehicles goes far beyond a mere subjective awareness that the campaigns might be conducted in Texas. It demonstrates the German manufacturers' intent to avail themselves of the benefits and protections of each and every market in which the recall and service campaigns were carried out. They did not simply anticipate that those campaigns would have an effect in Texas—they intentionally reached into this market with certainty that the fraudulent campaigns would be carried out on vehicles that were already here.

The *Nicastro* plurality also recognized that, "in some cases, as with an intentional tort, the defendant might well fall within the [s]tate's authority by reason of [the defendant's] attempt to obstruct its laws."[112] To the extent *Nicastro* has any bearing on the jurisdictional analysis here, the Texas statutes and regulations the State alleges the German manufacturers violated are explicitly applicable to vehicles actually in use on Texas roadways.[113] Among other things, those

---

[111] *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (plurality opinion).

[112] *Id.* at 880.

[113] 30 TEX. ADMIN. CODE § 114.20(b), (e); *see* TEX. HEALTH & SAFETY CODE § 382.085(b) ("A person may not cause, suffer, allow, or permit the emission of any air contaminant or the performance of any activity in violation of this chapter or of any commission rule or order."); TEX. WATER CODE § 7.101 ("A person may not cause, suffer, allow, or permit a violation of a statute within

regulations prohibit any person from "mak[ing] inoperable any system or device used to control" motor vehicle emissions or from selling, offering for sale, or using "any system or device which circumvents or alters any system, device, engine, or any part thereof, installed by a vehicle manufacturer to comply with the Federal Motor Vehicle Control Program *during actual in-use operation of a motor vehicle on Texas roadways*."[114]

The foreign manufacturers' conduct here—as described in the federal plea agreement and the German manufacturers' admissions—was both intentional and obstructive, which at the very least heightens the quality of their contacts with this forum. States, of course, have an interest in protecting against torts that take place within their jurisdiction, and "the Supreme Court has [also] recognized state interests in protecting regulatory schemes[.]"[115] Accordingly, in addition to the "plus-factor" conduct of exerting control over the distribution scheme that brought the corrupt software updates to Texas,[116] *Nicastro*

---

the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute.").

[114] 30 TEX. ADMIN. CODE § 114.20(b), (e) (emphasis added).

[115] *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013) (citing *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648 (1950), and *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

[116] *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 10 (Tex. 2021) (describing "creating, controlling, or employing the distribution system that brought the product into the forum state" as a type of "additional conduct" evidencing "'an intent or purpose to serve the market in the forum [s]tate,' *whether directly or indirectly*" (emphasis added) (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987) (plurality opinion))); *accord TV Azteca v. Ruiz*, 490 S.W.3d 29, 46 (Tex. 2016) (quoting *Asahi*, 480 U.S. at 112 (plurality opinion)).

suggests, if anything, that the German manufacturers could also be within a Texas court's authority by virtue of their intentional conduct undertaken to obstruct regulations that govern emissions compliance for vehicles operating on Texas roads.[117] In our view, engaging the forum with the specific intent to take actions to thwart the enforcement of an applicable regulatory scheme could not be more purposeful.[118]

The fraudulent nature of the scheme also differentiates this case from ordinary software updates that are consummated with consumer consent or released for download without regard to where the consumer is located or which product the updates target. The after-sale tampering software the German manufacturers deployed was targeted to specific end-user products, and downloading to the subject vehicles was facilitated by misrepresentations and outright lies to dealers and consumers about the nature and purpose of the recall and service work. The record does not indicate that the owners or operators of Affected Vehicles affirmatively consented to the installation of the defeat-device

---

[117] *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (plurality opinion); *Travelers Health*, 339 U.S. at 648 (recognizing the "state's interest in faithful observance" of its regulatory scheme by nonresidents).

[118] In *Michiana Easy Livin' Country, Inc. v. Holten*, we held that specific jurisdiction would not lie based solely on whether the defendant's conduct was tortious, holding that the jurisdictional analysis must focus on the defendant's contacts with the forum itself. 168 S.W.3d 777, 791-92 (Tex. 2005). That is, intent is not a substitute for the defendant's actual contacts with the *forum*, which, unlike questions about scienter, are generally a matter of physical fact. But unlike *Michiana*, which involved alleged misrepresentations ostensibly "directed at" a forum *resident* but otherwise occurring outside the forum, the conduct that allegedly violates state law in this case actually occurred in Texas. It is not a question of whether the State will succeed on the merits of its claims, but whether the defendants made purposeful contacts *with Texas* as a matter of physical fact.

software on their cars during recall or service work, but even if they did, any such consent was fraudulently procured by the unilateral actions of the defendants.

For these reasons, we cannot agree that the German manufacturers' contacts elsewhere nullify their contacts with Texas[119] or that those Texas contacts are attributable to mere fortuity or the unilateral acts of third parties.

### 3. Forum Benefit, Advantage, or Profit

Even so, nonresident defendants purposefully avail themselves of a forum state's jurisdiction only when they "seek some benefit, advantage[,] or profit" from their contacts with the jurisdiction.[120] "Jurisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there. By contrast, a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction."[121]

Both German manufacturers sought a benefit by availing themselves of Texas's jurisdiction—VW Germany perhaps more obviously because it had a more direct financial incentive. By the terms of its Importer Agreement, VW Germany bore the ultimate burden to

---

[119] *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984); *Michiana*, 168 S.W.3d at 785.

[120] *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013).

[121] *Michiana*, 168 S.W.3d at 785.

pay for all repairs covered by warranty and recall work for affected Volkswagen vehicles. VW Germany reimbursed VW America for all warrantied and recall work that local dealers undertook on Volkswagen cars, including for the recall and service actions at issue in the underlying litigation. In the same way, Audi was contractually responsible for financing warranty and recall work and reimbursed VW America for the recall and service actions the dealers performed on Audi cars, but for some—or all—of the work at issue here, VW Germany may have subsequently reimbursed Audi.

The after-sale tampering came about after diesel particulate filters in Affected Vehicles with 2.0-liter engines began to crack due to a malfunction in the defeat-device technology that had been installed in the vehicles before their importation and sale by VW America. These filters were covered by warranty, so VW Germany bore the ultimate responsibility for covering the cost of replacing them, including those in some affected Audi models. The German manufacturers initiated the recall and service campaigns to prevent this damage to the filters and to defray high costs associated with the repairs. According to the record, the cost of replacing a single filter was over $1,000, and nationally, VW Germany saved up to $525,000 per month in reduced warranty costs as a result of the "fixes" effectuated by the software downloaded in the after-sale tampering campaigns. VW Germany did not break down those payments by state, so the record contains no evidence of what it paid to reimburse warranty claims originating in Texas. Nonetheless, after-sale tampering allowed VW Germany to save money by preventing damage that would later require warranty repair; VW Germany sought this benefit by initiating the recall and service campaigns for vehicles in

45

Texas—the second-largest market for sales of Affected Vehicles; and reimbursable service work was performed on 23,316 cars at Texas dealerships.

Audi may or may not have borne ultimate financial responsibility for warranty claims of the specific part at issue here—it says it did not, and the special-appearance record does not contradict that assertion—so it did not benefit from the after-sale tampering in all the same respects as VW Germany. But the record bears some evidence that Audi nonetheless benefitted in several significant ways. The most obvious is that Audi, like VW Germany, sought to prevent regulatory authorities from discovering that some of its cars—including cars owned and operated in Texas—did not comply with federal emissions standards so it would not have to recall, replace, or otherwise be held accountable for exporting illegal vehicles. Additionally, Audi, like VW Germany, would have obtained nonmonetary benefits in Texas in the form of enhanced relationships with consumers and the avoidance of adverse publicity. By initiating campaigns to further conceal the defeat devices installed in Affected Vehicles owned, operated, and serviced in Texas, VW Germany and Audi availed themselves of the benefits and privileges of conducting business activities in Texas. These contacts with Texas were not accidental and, instead, allowed the German manufacturers to exploit the Texas market to their benefit and advantage until the artifice was uncovered.[122] All three factors of the purposeful-availment analysis are therefore satisfied.

---

[122] *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2007).

## 4. Response to the Dissent

The dissent's analysis misses the mark in several important respects.  First, the opinion focuses on initial vehicle sales and related provisions of the Importer Agreements while neglecting the after-sale recall and service campaigns and the contract provisions governing them.  This misstep leads the dissent's analysis astray.  The proper focus is on the German manufacturers' purposeful use of existing distribution channels and an established control structure to bring a tainted product—the defeat-device software updates—to specifically targeted vehicles that were being serviced in Texas and operated on Texas roadways.[123]  While the German manufacturers engaged in conduct outside of Texas with regard to the after-sale tampering, as the dissent says, there was nonetheless a direct line from the German manufacturers to Texas through their chosen business structure.  The dissent's assertion that "[u]nder today's holding, any foreign manufacturer directing its U.S. distributor to conduct a nationwide recall will be subject to personal jurisdiction in Texas courts, regardless of whether it targeted Texas,"[124] is an obvious oversimplification that ignores (1) the level and nature of control the German manufacturers retained and exercised over both the recall campaigns and the service campaigns and (2) the requirement of a causal nexus between the forum

---

[123] The dissent's rationale for absolving the German manufacturers of their purposeful contacts with Texas is that they only conducted recall and service campaigns on vehicles in Texas because of VW America's "*own* decision to target the Texas market for car sales in the first instance."  *Post* at 16 n.9, 18.  VW America's decisions about initial vehicle sales may have put the target here, but the German manufacturers knowingly and purposefully shot at it.

[124] *Id.* at 4.

contacts and the operative facts of the litigation, which narrows the class of claims that could give rise to specific personal jurisdiction.

Second, the dissent is dead wrong in saying that (1) the record bears no evidence that the German manufacturers controlled the means, details, and manner of the wrongful conduct that was perpetrated in Texas and (2) the Importer Agreements preclude the distributor and dealers from acting as the manufacturers' agents for purposes of the recall and service campaigns. Because no findings of fact were issued, we are obligated to view the record favorably to the trial court's jurisdictional rulings,[125] and as we have described in some detail, the record bears substantial evidence that the German manufacturers controlled the means, details, and manner in which VW America and its dealership network executed the recall and service campaigns.[126] The

---

[125] *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

[126] Despite ample evidence to support an implied finding of the manufacturers' control over the distribution system, the distributors, and the dealerships with regard to installation of the post-sale modifications to Affected Vehicles in Texas, the dissent intimates that "the State's own admissions" prevent us from considering that evidence. *See post* at 20. The dissent points to the State's recently filed summary-judgment motion as precluding the conclusion that the German manufacturers controlled the means and details of the recall and service campaigns by arguing that VW America "not only 'arranged, managed, promoted, [and] advertised' but also 'directed' the recalls at Texas dealerships." *Id.* But such arguments are not inconsistent with the State's position—and the manufacturers' admissions—that the distributor was contractually obligated to undertake such actions, and did do so, at the manufacturers' direction. As VW Germany's corporate representative testified, when the manufacturer initiates a recall, "everybody has to follow." Rather than adhering to the applicable standard of review, the dissent's analysis views the record contrary to the trial court's ruling.

48

German manufacturers determined which vehicles would be tampered with, how the tampering would occur, and what the dealers and consumers would be told about the purpose of the recall and service campaigns. Just as importantly, the German manufacturers provided the means of implementation—not only the software updates themselves but also the proprietary diagnostic system the dealers used to identify the targeted vehicles and download the updates to those vehicles when presented for recall or service work. The German manufacturers uploaded the software onto their server, which was "synchronized" with the distributor's server, and then the software was available by "automated download" for installation into specific vehicles via the manufacturers' proprietary diagnostic system. The record does not show that VW America or the dealers had any control over whether these automated actions occurred.[127]

This conclusion is further bolstered by the Importer Agreements, which give the German manufacturers control over the execution of

_____

But the dissent's reliance on this filing is also troubling for other reasons: (1) the motion is outside the special-appearance record; and (2) litigants are not prohibited from taking contrary positions in the same proceeding. And most importantly, VW America's participation in and knowledge of the scheme, if any, does not negate the substantial evidence that the German manufacturers controlled the distribution system in the relevant way. The outcome of the State's motion for partial summary judgment on its claims against VW America remains to be seen, but we fail to see how the allegations recounted by the dissent have any bearing on Texas courts' specific jurisdiction over the German manufacturers.

[127] *See TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016) (explaining that once sufficient jurisdictional facts have been pleaded, the burden shifts to the defendant to negate all pleaded bases for jurisdiction and observing that any conflicts in the evidence must be resolved in favor of the trial court's special-appearance ruling).

recall and service campaigns, including by requiring VW America and its dealerships to perform all "warranty repairs and/or services and repair[s]" and "all maintenance work and/or repairs" "in accordance with [the German manufacturers'] instructions, guidelines[,] and/or procedures." Not only is there evidence that VW America and the dealers were not looped in to the manufacturers' scheme, but the Importer Agreements' express terms left them no choice about whether and how to perform the post-sale tampering campaigns.[128] The dissent's contention otherwise misstates the record.

General language in the Importer Agreements purporting to disclaim an agency relationship between the German manufacturers and VW America does not overcome the Agreements' specific language requiring *all* the downstream entities to do the German manufacturers' bidding with respect to recall and service work. An agent may act on

---

[128] With a mere perfunctory citation to the Texas Occupations Code, the dissent implies that the German manufacturers could not lawfully contract to retain control over recall and service campaigns for branded vehicles because, under the Code, (1) "a manufacturer or distributor may not directly or indirectly: . . . operate or control: . . . a franchised dealer or dealership" and (2) any franchise term or condition that is "inconsistent with [Chapter 2301] is unenforceable." *Post* at 15 n.7; TEX. OCC. CODE §§ 2301.003(b), .476(c)(2). Although the German manufacturers have never cited either provision, we will assume the dissent's inferred construction of the statute is proper. Even so, the pertinent inquiry is not whether the German manufacturers *lawfully* retained and exercised control over the recall and service campaigns at issue here but whether they *actually* retained and exercised control. As we have explored in some depth, evidence of the latter is more than ample to support the trial court's special-appearance ruling.

the principal's behalf for a specific purpose; it need not serve as the agent for all purposes.[129]

Finally, the dissent errs in presenting *Spir Star* and *Luciano* as establishing circumstances necessary, as opposed to sufficient, to assert jurisdiction over a nonresident entity. While the foreign defendants' forum contacts in those cases differ from the German manufacturers' contacts in this case, the dissent cannot point to any authority finding personal jurisdiction lacking when a foreign manufacturer retained control over a distribution method it subsequently employed to bring a product to the forum state as part of a plot to deceive consumers and government regulators. To the contrary, the dissent acknowledges, as it must, that the stream-of-commerce "'plus factor' requirement may be satisfied by a foreign defendant's . . . exercise of control over . . . the distribution system that brought goods into Texas."[130] That is exactly what happened here.[131]

---

[129] *Cf. Jenkins v. Alexander*, No. 03-95-00377-CV, 1997 WL 217176, at *2 (Tex. App.—Austin May 1, 1997, pet. denied) (not designated for publication) (describing a "special agent" who is "empowered to perform only a particular task or a particular class of work," as opposed to a "general agent," who is "empowered to transact all the business of his principal of a particular kind or in a particular place" (quoting *First Nat'l Bank v. Kinabrew*, 589 S.W.2d 137, 145 (Tex. App.—Tyler 1979, writ ref'd n.r.e.))).

[130] *Post* at 2.

[131] The dissent also references two federal district court cases involving claims against foreign automobile manufacturers—one in which the district court found the manufacturers amenable to the forum's jurisdiction and one in which the court found to the contrary. *See id.* at 26-27 & 29-30 (citing *In re Volkswagen "Clean Diesel" Litigation*, No. CL-2016-9917, 2018 WL 4850155, at *3, *6 (Va. Cir. Ct. Oct. 4, 2018), and discussing *Thornton v. Bayerische Motoren Werke AG*, 439 F. Supp. 3d 1303 (N.D. Ala. 2020)). But the dissent's

suggestion that these cases *required* physical presence in the forum or some degree of overlapping governance among the manufacturer and distributor is inaccurate.

The district court in *In re Volkswagen* noted that language in the importer agreements "insinuates that [VW America] had no control over the marketing and advertising materials for the fraudulent vehicles at the heart of Plaintiffs' claims," but the court had no occasion to "rule on the agency argument alleged by Plaintiffs" in light of the court's finding "that the German Defendants already established enough contacts with Virginia alone" through participation in in-state activities to produce the fraudulent marketing materials. 2018 WL 4850155, at *3, *6.

*Thornton* involved complaints about an allegedly defective safety component that was installed in the manufacturer's vehicles prior to their initial sale in the United States; that case did not involve post-sale alteration of the component or any recall or servicing of the component. 439 F. Supp. 3d at 1306-08. The district court summarily rejected various bases for personal jurisdiction, including that the manufacturer had targeted the forum state (1) based on its targeting of the United States for *initial vehicle sales* and (2) based on its "established relationship" with a handful of local dealerships. *Id.* at 1311. The court rejected the first argument with a mere citation to the plurality opinion in *Nicastro* and the second because the plaintiff failed to "cite[] any evidence to support it or provide[] any specific facts about the nature and extent of the alleged relationship." *Id.* We need not opine on the persuasiveness of the court's analysis, but we note that (1) the instant case concerns contacts related to post-sale recall and service tampering, not initial sales of the Affected Vehicles, and (2) here, the State has produced evidence of the German manufacturers' control over the distributor and local dealerships with respect to the specific actions giving rise to the underlying lawsuit.

The dissent also parenthetically cites *Rickman v. BMW of North America LLC* for the proposition that "[the district] court could not assert personal jurisdiction over [a] company that [had] developed deceptive recall software in Germany where it had only exhibited 'general efforts to target [the] U.S. market,'" *post* at 27, but the dissent's citation to this holding is misplaced because, there, the claims against the defeat-device maker did not involve a recall, post-sale tampering claims, or any allegation that the foreign defendant controlled the distribution channel, 538 F. Supp. 3d 429, 434, 439 (D.N.J. 2021). More importantly, unlike this case, the claims in *Rickman* that the dissent references were against a foreign component supplier and were based on the initial sale of vehicles in the U.S., which occurred after the defeat-device

52

Accordingly, we turn now to the second prong of the specific-jurisdiction inquiry: whether the State's claims are sufficiently related to those contacts.[132] Because this additional constraint on specific personal jurisdiction is not genuinely contested here, the dissent fails to consider it.[133] But skipping over this essential component of the jurisdictional inquiry causes the dissent to gravely overstate the scope of our holding.[134]

## C. Connection to the State's Claims

Whether the defendant has contacts with the forum state is the beginning but not the end of our inquiry because "[s]pecific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's activity within the forum."[135] An "affiliation" must exist

---

component had been supplied to the foreign manufacturer for installation in its vehicles. *Id.* at 431, 434, 439. In concluding that the plaintiffs' allegations were inadequate to plead personal jurisdiction against the component supplier, the court's analysis demonstrates that the circumstances there are materially distinguishable from those in this case: "There is nothing in the Amended Complaint to plausibly allege that [the foreign component developer] worked directly with [the U.S. distributor, whose principal place of business was in the forum]. Rather, the Amended Complaint paints a picture of [the component developer] and [the foreign manufacturer] working to implement the defeat devices, inferably in Germany." *Id.* at 439.

[132] *E.g.*, *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021).

[133] *See post* at 6 ("The German manufacturers concede that the relatedness prong is not in dispute here, leaving only a question of purposeful availment[.]").

[134] *Id.* at 4 (proclaiming that today's holding subjects any foreign manufacturer directing a nationwide recall to personal jurisdiction in Texas).

[135] *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 156 (Tex. 2013); *see Ford Motor Co.*, 141 S. Ct. at 1025-26.

"between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum [s]tate and is therefore subject to the [s]tate's regulation.'"[136] But specific jurisdiction does not necessarily require proof of causation—"*i.e.*, proof that the plaintiff's claim came about *because of* the defendant's in-state conduct."[137] Relationships may "support jurisdiction without a causal showing" even when the litigation merely relates to the defendant's forum contacts.[138] In this case, the State's civil-enforcement claims ineluctably arise out of or relate to the German manufacturers' after-sale tampering conduct.[139] The conduct at issue took place in

---

[136] *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

[137] *Ford Motor Co.*, 141 S. Ct. at 1026 (emphasis added).

[138] *Id.*

[139] In *Ford Motor Co.*, the Supreme Court noted that the "first half" of the "arises out of or relates to" standard—that is, the "arises out of" half—"asks about causation," while "the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* Because the State's after-sale tampering claims clearly arise out of the recall and service tampering itself—a direct causal relationship connects the litigation to the contacts—we "need not determine whether [the] 'substantial connection' standard" articulated in our precedent "exceeds the bounds of due process." *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 16 n.5 (Tex. 2021*)*.

54

Texas, is subject to Texas's regulation under Texas law,[140] and will form the "focus of the trial."[141]

The requisite relatedness is illustrated by contrasting the facts alleged in this case with *Moncrief Oil International Inc. v. OAO Gazprom*.[142] There, a Texas resident argued that Texas courts could permissibly exercise jurisdiction over a Russian defendant that tortiously interfered with the resident's business relationships.[143] But we held that even though the defendant was amenable to specific jurisdiction on a different claim, Texas courts could not exercise personal jurisdiction with respect to the tortious-interference claim because the alleged interference arose out of a meeting that took place

---

[140] *See* TEX. HEALTH & SAFETY CODE § 382.085(b); TEX. WATER CODE §§ 7.101–.102; 30 TEX. ADMIN. CODE § 114.20(b), (e); *see Bristol-Myers Squibb*, 137 S. Ct. at 1780 ("In other words, there must be . . . an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." (internal quotation marks and alteration omitted)).

[141] *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007) (explaining that the defendant's Texas contacts and the litigation's operative facts were not sufficiently related when the "focus of the trial" would be on events that took place outside of Texas, which would "consume most if not all of the litigation's attention" and toward which "the overwhelming majority of the evidence [would] be directed"); *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 156-57 (Tex. 2013) (looking to the events principally involved in the merits claims to determine whether the defendant's Texas contacts and the operative facts of the litigation were sufficiently related to support specific jurisdiction).

[142] 414 S.W.3d 142 (Tex. 2013).

[143] *Id.* at 156.

exclusively in California.[144]  We explained that "a nonresident directing a tort at Texas from afar is insufficient to confer specific jurisdiction."[145]

This case presents the opposite scenario and, predictably, produces the opposite result.  Unlike *Moncrief*, which involved an alleged tort committed elsewhere that merely produced effects in Texas,[146] the after-sale tampering took place *in Texas*; the State's claims arise directly out of that conduct; and the substantiality of the connection is "enhanced" by Texas's strong interest in protecting its regulatory scheme,[147] which includes ensuring faithful observance by nonresidents and vindicating violations of its own laws in its own courts.

Because the State's after-sale tampering claims clearly arise out of or relate to the German manufacturers' contacts with Texas, the German manufacturers have established contacts that are sufficiently connected to Texas to satisfy due-process guarantees.[148]

---

[144] *Id.* at 157.  The plaintiff also alleged that the nonresident defendant's establishment of a Texas subsidiary to compete with the plaintiff subjected the defendant to Texas's jurisdiction.  *Id.*  We disagreed because the parent did not sufficiently control the subsidiary such that the subsidiary's Texas contacts could be imputed to the nonresident parent.  *Id.*  As explained above, there is no need to impute VW America's contacts to the German manufacturers given their control over the software-update distribution stream.

[145] *Id.* (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790-92 (Tex. 2005)).

[146] *See id.*; *see also, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 290 (2014) ("The proper question is not where the plaintiff experienced a meaningful injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

[147] *See Moncrief Oil*, 414 S.W.3d at 152.

[148] *See, e.g.*, *Walden*, 571 U.S. at 283.

## D. Fair Play and Substantial Justice

"Once minimum contacts have been established, we must still consider whether, for other reasons, exercising jurisdiction over the nonresident defendant would nevertheless run afoul of 'traditional notions of fair play and substantial justice.'"[149] While this catchphrase is "well known to appellate courts," it is nonetheless "imprecise."[150] When a nonresident defendant has minimum contacts with the forum, "rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice."[151] To avoid jurisdiction, the defendant would have to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable."[152]

At oral argument, the German manufacturers forthrightly conceded that if the standard for specific jurisdiction were satisfied, traditional notions of fair play and substantial justice would not preclude Texas courts from exercising personal jurisdiction, and we agree. Accordingly, the trial court did not err in exercising specific personal jurisdiction over the German manufacturers.

---

[149] *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 18 (Tex. 2021) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

[150] *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

[151] *Moncrief Oil*, 414 S.W.3d at 154-55.

[152] *Guardian Royal Exch. Assurance, Ltd. v. Eng. China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

### III. Conclusion

Unlike many personal-jurisdiction disputes in which a nonresident manufacturer has merely placed a product in a stream of commerce that fortuitously carried the product to the forum state, the German manufacturers effectively—and knowingly—dropped the tampering software down a chute that guaranteed it would land in Texas. The manufacturers developed the product, controlled the distribution stream that brought the product to Texas, and called all the shots. Because the trial court properly denied the special appearances, we reverse the court of appeals' judgment and remand to the trial court.

John P. Devine
Justice

**OPINION DELIVERED:** May 5, 2023

58